**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

JULY 26, 2005

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                      No. 126025

DUANE HOUSTON

      Defendant-Appellant.

_____

YOUNG, J.

This appeal concerns the proper method of scoring offense variable 3 (OV 3), which addresses "physical injury to a victim." MCL 777.33. The defendant in this case was convicted of second-degree murder on the basis of the shooting death of John Strong. Offense variable 3 requires the sentencing judge to select one from among the several listed scoring elements and assign points that range from a high of one hundred for a death to zero when no injury occurred. The sentencing guidelines require that the sentencing judge assess the *highest* number of points applicable. Generally speaking, the higher the number of points assessed, the longer the resulting sentence.

In determining defendant's sentence under the legislative guidelines, the trial court assessed twenty-five points for OV 3 because the victim suffered an injury—a gunshot wound. Defendant was sentenced to life imprisonment, in part on the basis of this scoring determination.

On appeal, defendant argues that he should not have been assessed *any* points for OV 3. This variable provides that the sentencing court must score one hundred points when a victim dies *unless* homicide is the sentencing offense. Defendant would have been appropriately assessed one hundred points but for the fact that second-degree murder, a form of homicide, was the sentencing offense. Defendant argues that none of the other variable elements requiring the assessment of points was applicable and, therefore, the trial court's only option was to assess *zero* points.

We disagree. The defendant not only killed the victim, but in the process also caused a physical injury—a gunshot wound to the head.[1] Consequently, although the

---

[1] The dissent detects an "inconsistency" between our recognition that the victim suffered an injury and our conclusion that the victim suffered a life-threatening injury. *Post* at 1. But a life-threatening injury *is* an injury. We fail to see an "inconsistency" here.

2

court did not have the option of assessing one hundred points for OV 3, it properly assessed twenty-five points on the basis of the next applicable variable element: "Life threatening or permanent incapacitating injury." This conclusion is mandated by the fact that the statute governing OV 3 requires that trial courts assess the highest number of points possible.

Accordingly, we affirm the judgment of the Court of Appeals.

FACTS AND PROCEDURAL HISTORY

In December 2001, John Strong was the victim of an attempted robbery in Flint, Michigan. During the course of the robbery, Mr. Strong's assailant shot him in the head, killing him. Defendant Duane Houston was charged with Mr. Strong's death. Although he maintained his innocence throughout his trial, defendant was convicted by a jury of second-degree murder[2] and possession of a firearm during the commission of a felony,[3] and was acquitted of assault with intent to rob while armed.[4] The court sentenced defendant as a second felony offender to a term of life, plus a term of two years.

---

[2] MCL 750.317.

[3] MCL 750.227b.

[4] MCL 750.89.

3

Defendant appealed by right to the Court of Appeals, arguing that the trial court had misscored OV 3 and offense variable 14 (OV 14)[5] and had erred by sentencing him to life imprisonment as an habitual offender.[6] In affirming defendant's convictions, the panel assumed arguendo that the offense variables were scored erroneously, but held that any error was harmless because defendant was properly sentenced to life imprisonment as a repeat offender.[7]

In November 2004, we granted defendant's application for leave to appeal, limiting the parties to the following issues: "(1) whether Offense Variable 3, MCL 777.33, was properly scored and (2) whether a sentence of life imprisonment falls within the statutory sentencing

---

[5] Our order granting leave to appeal in this case was limited to considering the scoring of OV 3. 471 Mich 913 (2004). Indeed, the Court of Appeals opinion notes that any error in scoring OV 14 would not have affected defendant's sentence. 261 Mich App 463, 471; 683 NW2d 192 (2004). We do not address OV 14 in this appeal.

[6] Defendant also argued before the Court of Appeals that the trial court abused its discretion in admitting evidence regarding defendant's possession of a weapon similar to that used in the murder. 261 Mich App 465-470. The Court of Appeals panel rejected that argument and we excluded that issue from our limited order granting leave to appeal. 417 Mich 913.

[7] 261 Mich App 472-473.

guidelines for second-degree murder for a defendant who is an habitual offender."[8]

## STANDARD OF REVIEW

Statutory construction is a question of law subject to review de novo.[9] Our paramount task is to discern and give effect to the Legislature's intent as manifest in the plain, unambiguous language of its statutes.[10]

## ANALYSIS

### I

We must begin, as always, with the language of the governing statutes. At the time defendant was sentenced,[11] MCL 777.33 (OV 3) provided:

> (1) Offense variable 3 is physical injury to a victim. Score offense variable 3 by determining which of the following apply *and by assigning the number of points attributable to the one that has the highest number of points*:
>
> (a) *A victim was killed*.......100 points
>
> (b) *A victim was killed*.........35 points

---

[8] 471 Mich 913.

[9] *People v Perkins,* 468 Mich 448, 452; 662 NW2d 727 (2003).

[10] *Lansing Mayor v Pub Service Comm,* 470 Mich 154, 157; 680 NW2d 840 (2004).

[11] MCL 777.33 was later amended in a manner not germane to the legal question at issue here.

(c) *Life threatening or permanent incapacitating injury occurred to a victim..............................25 points*

(d) Bodily injury requiring medical treatment occurred to a victim.......10 points

(e) Bodily injury not requiring medical treatment occurred to a victim.......5 points

(f) No physical injury occurred to a victim..............................0 points

(2) All of the following apply to scoring offense variable 3:

(a) In multiple offender cases, if 1 offender is assessed points for death or physical injury, all offenders shall be assessed the same number of points.

(b) *Score 100 points if death results from the commission of a crime and homicide is not the sentencing offense.*

(c) Score 35 points if death results from the commission of a crime and the offense or attempted offense involves the operation of a vehicle, vessel, ORV, snowmobile, aircraft, or locomotive under the influence or while impaired causing death.

(d) Do not score 5 points if bodily injury is an element of the sentencing offense.

(3) As used in this section, "requiring medical treatment" refers to the necessity for treatment and not the victim's success in obtaining treatment. [Emphasis added.]

Defendant argues that, because the statute governing OV 3 prohibits the trial court from scoring one hundred points on the basis of the death of the victim when homicide is the sentencing offense, the court in this case

6

was required to assess *zero* points. Implicit in this argument is the assumption that only the "ultimate result" of a defendant's criminal act—here, the death rather than the injury that preceded the death—may be considered in scoring OV 3. The prosecution argues, on the other hand, that the court correctly assessed twenty-five points for OV 3. Because the court was precluded from considering the victim's death under MCL 777.33(2)(b), it could, in the prosecution's view, consider and score the next applicable factor on the basis of the physical injury that preceded the victim's death.

Faithful application of the plain language of MCL 777.33 demonstrates that the prosecution is correct and that defendant was properly assessed twenty-five points for OV 3 in this case.

The Legislature expressly prohibited the assessment of one hundred points when, as here, the underlying offense is homicide.[12] Consequently, one hundred points under MCL 777.33(1)(a) must be excluded as a possible assessment for OV 3.[13]

---

[12] MCL 777.33(2)(b).

[13] MCL 777.33(2)(c) states that thirty-five points are to be scored only when the underlying offense "involve[s] the operation of a vehicle, vessel, ORV, snowmobile,

It is equally clear, according to the plain language of MCL 777.33(1)(f), that zero points must be excluded as an option because zero points may be assessed under that subsection only when "[n]o physical injury occurred to a victim."[14] The gunshot wound to the victim's head in this case unquestionably constitutes a physical injury.

---

aircraft, or locomotive . . . ." Because the underlying offense in this case did not involve the operation of any of the listed conveyances, thirty-five points under MCL 777.33(1)(b) must be excluded as a possible assessment for OV 3 as well. Five points under MCL 777.33(1)(e) must also be excluded; the victim did not suffer a "bodily injury *not* requiring medical treatment" because a gunshot wound to the head is, quite obviously, a bodily injury that does require medical treatment.

[14] It may also be appropriate in some cases to score zero points where "[b]odily injury not requiring medical treatment occurred to a victim" and "bodily injury is an element of the sentencing offense"—although, as discussed earlier, "[b]odily injury *not* requiring medical treatment" does not apply to the victim in this case. MCL 777.33(1)(e) and (2)(d). Justice Cavanagh believes this supports his position. We disagree.

MCL 777.33 requires that the trial court assign the greatest number of points possible when scoring OV 3. When (a) a victim incurs a bodily injury not requiring medical treatment and (b) bodily injury is an element of the sentencing offense, the highest number of points possible under OV 3 is *zero points*. But when a victim dies after receiving a life-threatening injury, the highest number of points possible is *twenty-five* points. Justice Cavanagh's argument is therefore premised on failure to follow a clear statutory requirement: that of assessing the highest number of points possible.

Therefore, the trial court did not have the option of scoring zero points for OV 3.[15]

The only options left for the trial court, therefore, were to assess either twenty-five points under MCL 777.33(1)(c) or ten points under MCL 777.33(1)(d) on the basis of the life-threatening bodily injury requiring medical treatment sustained by the victim—viz*., the gunshot wound to the victim's head. Because the statute directs the trial court to award the highest number of points possible under OV 3, the trial court was required to assess twenty-five points under MCL 777.33(1)(c).[16]

---

[15] Justice Cavanagh posits that "[i]f homicide is an element of the sentencing offense, a defendant should not be assessed *any points* for OV 3 . . . ." *Post* at 7 (emphasis added). However, MCL 777.33(2)(b) states that if homicide is an element of the sentencing offense, a defendant should not be assessed *one hundred points* for OV 3. In other words, MCL 777.33(2)(b) specifically precludes the scoring of *one hundred points* where the sentencing offense is a homicide. If the Legislature, as the dissent contends, had intended to preclude the scoring of *any points* where the sentencing offense is a homicide, why did it only specifically preclude the scoring of *one hundred points*? Indeed, that the Legislature precluded the scoring of *one hundred points* where the sentencing offense is a homicide suggests that the Legislature intended *some points* to be scored where the sentencing offense is a homicide.

[16] The dissent asserts that MCL 777.33(1)(c) is simply inapplicable where a victim actually dies after receiving a life-threatening injury, maintaining that there is a critical distinction between a "life-threatening" or "potentially fatal injury" and a "life-ending" or "fatal injury." *Post* at 2-3. We see no support in the statute for the position that an injury that *actually* causes death

9

Therefore, the trial court correctly assessed twenty-five points for OV 3. When defendant's offense variables are properly scored, his recommended sentence under the legislative guidelines is 180 to 300 months or life. Accordingly, the trial court did not err in sentencing defendant to life for second-degree murder, and its sentence must be affirmed.

---

cannot be said to have once been a "life-threatening" or "potentially fatal injury."

Nor does the dissent's distinction have much logical appeal. Suppose that Mr. Jones was the victim of a life-threatening injury—say, severe head trauma—on Day 1 and is hospitalized. On Day 50, despite heroic medical efforts to save him, Mr. Jones dies. The defendant is charged with homicide for the resulting death of the victim. Under the dissent's rationale, Mr. Jones's severe head trauma was never a "life-threatening injury" because, in the end, he actually died.

Thus, the dissent's "interesting conundrum" is purely the product of its own "contorted analysis." *Post* at 4-5. Contrary to the dissent, we think it *can* be said that a victim who "dies instantly" has suffered a "life-threatening injury." *Id.* In this case, the victim suffered a gunshot wound to the head. Although the shot may have killed him immediately, the fact remains that the *injury itself* was truly life-threatening. Indeed, to paraphrase Justice Markman's dissenting statement in *People v Hauser,* 468 Mich 861, 862 (2003), the victim sustained an injury so life-threatening that it was followed by his death.

Our conclusion in part I follows from the plain language of the statute and the undisputed facts in this case.

Defendant offers three arguments to counter this reading of the statute governing OV 3. First, he asserts that only the ultimate outcome of the criminal act—the victim's death, in this case—may be considered in scoring OV 3. The statute obviously contains no "ultimate outcome" requirement.[17] Rather, it instructs courts to "[s]core offense variable 3 by determining which of the following *apply* and by assigning the number of points attributable to the one that has the *highest number* of points."[18] This language indicates that the Legislature believed that multiple scoring factors may apply to a single offense. The statute simply indicates that the one scoring factor ultimately selected should (a) be applicable and (b) yield the highest number of points possible. Where more than one factor might apply (e.g., when a life-threatening injury requires medical treatment), the one generating the highest points is the correct one. The defendant's assumption that

---

[17] See part I of this opinion (quoting the relevant statutory language).

[18] MCL 777.33(1) (emphasis added).

11

only the ultimate outcome of the defendant's act may be considered in scoring OV 3 is therefore undermined by the statutory language.

Defendant's second argument is a variation on the first. Defendant argues that OV 3 presents a "graduated scale," meting out the greatest number of points to those who inflict the greatest harm. In light of this purported "scale," it would be incongruous, in defendant's view, to assess twenty-five points for a mere physical injury when the defendant caused the victim's *death*.

This argument, however ironic,[19] is unpersuasive for the reasons already noted. The Legislature intended for multiple factors to apply and directed courts to select one in order to assess the highest number of points possible. The Legislature has explicitly eliminated the option of assessing one hundred points in homicide cases, but not the requirement of assessing the "highest number of points" possible. The graduated nature of OV 3 therefore does not lead to the conclusion that defendant may receive zero points for this offense variable.

---

[19] To the extent that more egregious crimes should receive higher points as the statute directs, it is surely more consistent with defendant's purported "scale" to assess him twenty-five rather than zero points.

Finally, defendant argues that zero points must be scored for OV 3 because the Michigan offense variables "*generally* [indicate] a legislative policy of not assessing points for factors that are inherent in the elements of the offense for which the defendant is being sentenced."[20] Thus, defendant argues: "With the exception of the anomalous and later-added MCL 777.33(1)(b), involving alcohol-related deaths, this OV assesses points for aggravating circumstances, not for factors inherent in the sentencing offense itself."

This is an odd and unpersuasive argument. We consistently look to and enforce the plain language of statutes rather than some imagined "legislative purpose" supposedly lurking behind that language.[21] The text of MCL 777.33 is quite clear and, as shown in part I, requires the assessment of twenty-five points in this case. Defendant offers no reason to abandon our usual rule of statutory construction.

Moreover, the Legislature has in this very statute demonstrated its ability to preclude the scoring of points for circumstances that are a necessary element of the

_____

[20] Defendant's brief at 5 (emphasis in original).

[21] See, e.g., *Sotelo v Grant Twp,* 470 Mich 95, 100; 680 NW2d 381 (2004).

13

sentencing offense. For instance, MCL 777.33(2)(b) precludes the scoring of one hundred points where death is an element of the sentencing offense. In addition, MCL 777.33(2)(d) precludes the scoring of five points where bodily injury is an element of the sentencing offense. Therefore, if the Legislature had intended to preclude the scoring of twenty-five points where death is an element of the sentencing offense, it clearly knew how to do so. Thus, none of defendant's arguments offers a persuasive reason to depart from the Legislature's intent as manifest in the plain language of the statute governing OV 3.

## CONCLUSION

On the basis of the foregoing, we conclude that the trial court did not err in assessing twenty-five points for OV 3 and sentencing defendant to life imprisonment. We therefore affirm the judgment of the Court of Appeals.[22]

> Robert P. Young, Jr.
> Clifford W. Taylor
> Maura D. Corrigan
> Stephen J. Markman

---

[22] However, for the reasons stated in Justice Cavanagh's dissent, we do not agree with the Court of Appeals analysis of MCL 777.21.

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                     No. 126025

DUANE HOUSTON,

    Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

I respectfully dissent from the majority's misguided interpretation of MCL 777.33. The internal inconsistency in the majority's reasoning is best illustrated by comparing its statement that when a person dies, the person has suffered an injury, see *ante* at 2, with its conclusion that when a person dies, the defendant who caused the death is subject to points for causing a "[l]ife threatening or permanent incapacitating injury . . . ." MCL 777.33(1)(c). While I agree that when a person dies, the person has presumably suffered an injury, I do not agree that when a person dies, the person has suffered a life-threatening or permanently incapacitating injury. Rather, I believe that the person has suffered an injury that ended the person's life, i.e., a life-*ending* injury, and that as such, twenty-

five points cannot be scored. Surprisingly, the majority's error is far removed from its assertion that its interpretation is true to the statutory language.

I do not disagree that for offense variable (OV) 3, the trial court must determine which characteristics of the defendant's crime apply and assess the highest number of applicable points. I disagree, though, that § 33(1)(c) *applies* to a situation in which a victim dies. In a departure from the plain language of the statute, the majority's reading requires substituting "life-ending" for "life-threatening."

In fact, the prosecutor's citations of dictionary definitions support my view. The prosecutor states that one dictionary defines "life threatening" as "potentially fatal." Another defines it as "very dangerous or serious with the possibility of death as an outcome." The prosecutor advocates that an injury that is "potentially fatal" is equivalent to an injury that is fatal. But an ordinary reading of the statute's phrase "[l]ife threatening . . . injury" indicates a situation in which a person receives an injury that threatens, but does not take, the person's life. Contrary to the majority, I would decline to accept the prosecutor's invitation to read "life-threatening injury" as "life-ending injury."

2

Had the Legislature intended that a potentially fatal injury include an injury actually causing death, it would have said so. On the basis of the myriad examples in our statutes in which the Legislature specifies that death is included, such as in the phrase "injury or death,"[1] I would find precluded an argument that where the Legislature says "[l]ife threatening or permanent incapacitating injury" it also means "life-ending injury." So it is not that defendant assumes that only the "ultimate result" of his criminal act can be considered in scoring OV 3, an argument the majority attributes to him. See *ante* at 7. Rather, defendant correctly argues that the injury he inflicted was not the type for which points can be assessed under § 33(1)(c). Although a victim of a homicide presumably suffers an injury, the type of injury the victim suffers is a life-ending one, not a life-threatening or permanently incapacitating one.

---

[1] A cursory search through our statutes shows that the Legislature is fully capable of using the term "injury or death" when it so means. Such a search reveals 156 instances in which the Legislature used some variation of the phrase "injury or death." Even more compelling is the Legislature's use of some variation of the phrase "injury or injury resulting in death" in several statutes. See, e.g., MCL 38.67a(3), 38.1390(1), 418.141, and 418.375(3). From this it is clear that when the Legislature intends to encompass *either* an injury *or* a death, or a death resulting from an injury, it is perfectly capable of stating what it means.

Moreover, I find unpersuasive the argument that had the Legislature intended to exclude a situation in which a victim dies from the "[l]ife threatening or permanent incapacitating injury" condition specified by MCL 777.33(1)(c), it would have said so. I find more persuasive the view that the Legislature likely did not foresee an attempt to equate a potentially fatal injury with a fatal one. Thus, it most likely found no need to do anything other than preclude the scoring of one hundred points for death when death is an element of the sentencing offense.[2] Quite simply, an injury that causes a death is not a life-threatening or permanently incapacitating injury. The latter, by its plain definition, presumes that the person has survived the physical attack.

The majority's reasoning results in an interesting conundrum and illuminates that its position is not true to the plain language of the statute or the Legislature's intent. Suppose a victim dies instantly.[3] Can it truly be said that the victim suffered a permanently incapacitating

---

[2] Similarly, under MCL 777.33(1)(e), five points are scored when "[b]odily injury not requiring medical treatment occurred to a victim." But MCL 777.33(2)(d) instructs, "Do not score 5 points if bodily injury is an element of the sentencing offense."

[3] It appears in this case that the victim did die instantly.

4

or life-threatening injury? At what point between the death-causing act and the death was the injury suffered?

If a permanently incapacitating or life-threatening injury cannot be ascertained in the above example, which I do not believe that it can, the majority would then consider if perhaps § 33(1)(d) ("[b]odily injury requiring medical treatment occurred to a victim") or § 33(1)(e) ("[b]odily injury not requiring medical treatment occurred to a victim") would apply. The majority asserts that "a gunshot wound to the head is, quite obviously, a bodily injury that does require medical treatment." *Ante* at 8 n 13. As such, it concludes that scoring five points under § 33(1)(e) ("[b]odily injury not requiring medical treatment occurred to a victim") must be *excluded*. But in an instantaneous death, no medical treatment *is* required. Would the majority then believe that five points were possible for an injury requiring no medical treatment? Under this contorted analysis, a defendant's OV 3 score becomes a function of how quickly and painlessly the defendant inflicted death on the victim. The more "efficient" the defendant is, the lower number of points the defendant will receive.

Certainly such an anomaly was not what the Legislature intended. I find incredible that the Legislature intended

5

the courts to delve into these physiological, and even philosophical, questions to reach a proper OV 3 score. Rather, I find quite clear on the face of the statute that the Legislature intended a certain number of points to apply when a victim dies, and fewer points to apply when a victim suffers various degrees of injury. Otherwise, there would be no reason to differentiate so drastically between the number of assessable points for death, one hundred, and the number of points for life-threatening or permanently incapacitating injury, twenty-five.[4]

Thus, it is clear to me that the plain language employed by the Legislature in the statute concerning OV 3 compels a conclusion that points for a "[l]ife threatening

---

[4] The majority states that where a victim does not die instantly, I would hold that the victim still did not suffer a "life threatening or permanent incapacitating injury." That is not entirely accurate. I would hold that, *for the purposes of scoring OV 3*, which assesses points for the *severity* of injury suffered, the victim suffered the most severe injury possible: death. I believe that it is obvious that the graduated scale of points corresponds to a graduated scale of types of injury. I do not believe that the Legislature designed OV 3 so that a prosecutor could make an end-run around the exemption the Legislature included that prevents scoring one hundred points when a victim dies and death is an element of the sentencing crime. In the context of the clear language and purpose of the statute, I conclude that the Legislature did not see the need to state the obvious, which is that when a victim dies, points are not scored for the types of nonfatal injuries enumerated in the statute. See *ante* at 9 n 16, 13.

6

or permanent incapacitating injury" are to be assessed only when the injury fits that definition. If homicide is an element of the sentencing offense, a defendant should not be assessed any points for OV 3, even if the victim could be considered to have suffered an "injury" before dying. "Injury" is not synonymous with "life-threatening or permanent incapacitating injury." Thus, I conclude that the trial court erroneously assessed twenty-five points where defendant's victim died and homicide was an element of the sentencing offense. I would reverse the trial court in that respect.

### The Availability of a Life Sentence

If the twenty-five points that were erroneously assessed under OV 3 were subtracted from defendant's score, defendant would fall within the II-B cell of the sentencing grid contained in MCL 777.61, which specifies a minimum sentence range of 162 to 270 months. After increasing the higher number by twenty-five percent in accordance with the second-offense habitual-offender statute, defendant's range becomes 162 to 337 months. Although the Legislature has provided sentencing grids that delineate the appropriate sentencing ranges for various combinations of OV and prior record variable (PRV) scores in MCL 777.61 through 777.69,

it has not provided separate grids for sentences that are increased when a defendant is an habitual offender.

In this case, the Court of Appeals determined that because defendant's upper minimum increased to 337 months by virtue of the habitual-offender statute, a life sentence was available. The Court of Appeals reasoned that other cells having an upper minimum of more than three hundred months offer the option of a life sentence, so the Legislature must have intended that any time an upper minimum is more than three hundred months, a life sentence is available.

Because the Legislature chose not to provide sentencing grids governing habitual-offender sentences, the plain language of the habitual-offender sentencing guidelines statute governs. The relevant statute, MCL 777.21, states:

> (3) If the offender is being sentenced under section 10, 11, or 12 of chapter IX, determine the offense category, offense class, offense variable level, and prior record variable level based on the underlying offense. To determine the recommended minimum sentence range, increase the upper limit of the recommended minimum sentence range determined under part 6 for the underlying offense as follows:
>
> (a) If the offender is being sentenced for a second felony, 25%.

Before applying the increase, defendant's upper minimum was 270 months. Two hundred seventy increased by twenty-five percent is approximately 337. Three hundred thirty-seven months is not life. I would conclude that if the Legislature had intended that a life sentence be an option, it would have so specified, either in the habitual-offender sentencing guidelines statutes or in a separate sentencing grid.

As such, I would decline to write the word "life" into the sentencing grid cell at issue. The Court of Appeals arbitrarily used three hundred months as a harbinger that a life sentence was available. But it is not at all clear that three hundred months is the dispositive guiding factor because cell III-A, in which 270 months is the upper minimum, allows for a life sentence. A more rational explanation is that the Legislature included a life option where it believed that the combined OV and PRV scores merited it. For instance, when a defendant amasses one hundred or more points in OVs, a life sentence is an option, even where the upper minimum is less than three hundred months. In that cell, III-A, the range is 162 to 270 months or life. And in cell I-C, where the OV total is relatively low, zero to forty-nine points, and the PRV level is zero to twenty-four points, the sentence range is

9

the same as that in the III-A cell, except that life is *not* an option. Thus, it appears that the availability of a life sentence is tied to the OV and PRV score totals, rather than the number of months represented by the upper minimum.

Here, neither defendant's OV nor PRV score changed by virtue of increasing his upper limit pursuant to the habitual-offender sentencing guidelines statute. Therefore, because a life sentence is not an option for defendants having the OV and PRV scores reflected by cell II-B, absent an articulated upward departure, a life sentence is not available even if the upper minimum is increased to reflect a defendant's habitual-offender status.

Thus, I would hold that in instances where a victim dies and homicide is an element of the sentencing offense, the proper score for OV 3 is zero points. Further, I would hold that if a defendant's upper minimum is increased pursuant to the habitual-offender sentencing guidelines statute, whether a life sentence is available depends on whether it is denoted in the legislative sentencing grids and not on the number of months in a defendant's upper minimum sentence. As such, I would reverse the decision of

10

the Court of Appeals and remand this case to the trial court for the appropriate resentencing.

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly

11